Igor AZRIELLI, Vladimir Kirchner, Nicholas Blinov, Beatrice Vest, Ilia Kalinovsky, Lev Katz, Riccobono Properties, Ltd., Aaron Roytenberg, Faina Kirchner, V. Zamaryonov, Plaintiffs–Appellants–Cross–Appellees,

v.

COHEN LAW OFFICES, James Khani, Defendants–Appellees–Cross–Appellants,

V. Bankin, Awada Investment Corp., Abelis Rachkauskas, Sergey Yekimov, Defendants–Appellees.

Nos. 327, 614, Dockets 93–7366, –7608.

United States Court of Appeals, Second Circuit.

Argued Oct. 14, 1993.

Decided April 6, 1994.

Joseph H. Neiman, Forest Hills, NY, for plaintiffs-appellants-cross-appellees.

Arnold Stream, Mineola, NY (Carole Burns & Associates, Mineola, NY, on the brief), for defendants-appellees-cross-appellants Cohen Law Offices and James Khani.

Allan Winston, Rye, NY (Winston & Winston, on the brief), for defendants-appellees V. Bankin, Awada Investment Corp., Abelis Rachkauskas and Sergey Yekimov.

Before: NEWMAN, Chief Judge, KEARSE, Circuit Judge, and TENNEY, District Judge.*

KEARSE, Circuit Judge:

Plaintiffs Igor Azrielli, *et al.*, appeal from so much of a judgment of the United States District Court for the Eastern District of New York, Denis R. Hurley, *Judge*, as dismissed their complaint asserting claims of securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b) (1988), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1993); claims of racketeering acts in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (1988) ("RICO"); and various claims under state law. The court granted defendants' motions for summary judgment dismissing the complaint, ruling that plaintiffs had come forward with no evidence to support certain elements of their 1934 Act and RICO claims, and declining to exercise pendent jurisdiction over their state-law claims. On appeal, plaintiffs contend that summary judgment was inappropriate because there were genuine issues to be tried as to each contested element. Defendants Cohen Law Offices and James Khani (collectively "Khani") have cross-appealed, challenging so much of the judgment as denied their motion for the imposition of sanctions against plaintiffs pursuant to Fed.R.Civ.P. 11.

For the reasons below, we conclude that the dismissal of the RICO claims against Khani was proper, but that evidence in the record revealed genuine issues of material fact with respect to plaintiffs' other claims against Khani and with respect to their federal claims against the other defendants, making summary judgment as to the latter two groups of claims inappropriate. Accordingly, we vacate so much of the judgment as dismissed plaintiffs' federal claims, other than the RICO claims against Khani, and we reinstate the state-law claims as well. Given this disposition, we reject the cross-appeal with regard to Rule 11 sanctions.

## I. BACKGROUND

The present action arises out of transactions related to the acquisition of an apartment building at 217 East 29th Street in New York City (the "building") in a purported "flip" sale, *i.e.*, a transaction in which one person acquires the right to purchase a property and immediately sells that right at a profit. The cast in the present case includes defendant V. Bankin, who, according to defendants, was the middle person in the flip sale; defendants Sergey Yekimov and Abelis Rachkauskas, who contend that they purchased from Bankin in the flip sale; Khani, who represented Bankin and/or Yekimov and Rachkauskas in most of the transactions at issue here; and the plaintiffs, to whom, at various times in 1985 and 1986, Yekimov and Rachkauskas in effect sold part of their interest in the flipped property.

### A. The Acquisition of the Building

On September 10, 1985, Bankin entered into a contract to purchase the building from 217 East 29th Street Equities Group ("Equities") for $770,000 ("September 10 contract"). On September 20, Bankin entered into a formal contract with Yekimov and Rachkauskas for the sale of the building to them for $989,000, a contract characterized by Yekimov and Rachkauskas as an "assignment" of Bankin's rights to them for $219,000 (the "flip/assignment"). Yekimov and Rachkauskas then sought investors.

On December 4, 1985, plaintiffs Azrielli, Beatrice Vest, Lev Katz, and V. Zamaryonov (collectively the "Group A" plaintiffs) entered into a shareholder agreement with Yekimov and Rachkauskas to form a corporation, Riccobono Properties, Ltd. ("Riccobono"), whose purpose was to purchase and manage the building. Under the shareholder agreement, Yekimov and Rachkauskas were to receive 70 percent of the Riccobono shares, and Group A 30 percent. The shareholders had the right to sell their shares, subject to other shareholders' right of first refusal. Rachkauskas or Yekimov sold some of their shares to plaintiffs Nicholas Blinov, Vladimir

Kirchner, Ilia Kalinovsky, Faina Kirchner, and Aaron Roytenberg (collectively the "Group B" plaintiffs) at various times during 1986.

In the meantime, Riccobono purchased the building on December 19, 1985. The closing documents stated that Riccobono paid a purchase price of $989,000.

## B. *The Present Action and the Decision Below*

Plaintiffs commenced the present action in 1988 principally against Yekimov and Rachkauskas, claiming violations of federal securities laws, RICO, principles of common-law fraud, and state statutory law. Plaintiffs asserted that the purported flip/assignment from Bankin to Yekimov and Rachkauskas was a sham transaction; that Yekimov and Rachkauskas had in fact purchased the building directly from Equities for $770,000 while representing falsely that they had purchased it from Bankin for $989,000; that the shares of Riccobono purchased by plaintiffs were based on the latter price; and that Yekimov and Rachkauskas falsely represented that their investment in Riccobono was proportionate to the investments of the plaintiffs. The complaint alleged that

> [a]t no time did BANKIN ever purchase the properties from [Equities], nor did BANKIN receive the $219,000.00 difference, which had he been involved in a flip, he would have received. None of the plaintiffs would have put in the amount of money they did, had they known the building had actually been bought for $770,000.00 as opposed to the $989,000.00.

(Complaint ¶ 28.) The complaint alleged that Yekimov and Rachkauskas had "pocketed $219,000.00 in cash [out of] which they fraudulently and deceptively cheated the plaintiffs." (*Id.* ¶ 26.)

Plaintiffs alleged that Bankin had participated in the fraudulent scheme "by allowing his name to be used on the bogus contract and showing up at the closing." (*Id.* ¶ 30.) They alleged that Khani had furthered the scheme by helping to persuade many of the plaintiffs that Yekimov and Rachkauskas "were legitimate, were in fact[ ] paying $989,-000.00 for the building and that the building was worth it." (*Id.* ¶ 31.)

The complaint also alleged that the acts of Yekimov and Rachkauskas "constitute[d] at least two acts of fraud in connection with the purchase and sale of securities" (*id.* ¶ 35), and that "Rachkauskas and Yekimov committed other acts of fraud and theft during the time period covered by RICO" (*id.* ¶ 36), including "set[ting] up bogus real estate deals in New Jersey with plaintiff Nicholas Blinov" (*id.* ¶ 37).

In addition, in opposition to early motions by defendants for summary judgment, several of the plaintiffs submitted affidavits stating that prior to purchasing their shares they had not been informed that there was a flip sale. Defendants' early summary judgment motions were denied, and discovery followed.

In 1992, defendants again moved for summary judgment, contending that all parties to the transaction had known (a) that the transaction was a flip sale, (b) that Bankin purchased the building and assigned his interest in it to Yekimov and Rachkauskas, and (c) that the $219,000 difference between the $770,000 price shown in the September 10 contract and the $989,000 paid by Riccobono was paid to Bankin in December 1985 as an assignment fee. Khani argued in addition that, because he was merely the attorney for Yekimov and Rachkauskas, and not a principal, the complaint failed to state a claim against him under the securities laws or RICO. Defendants also moved for the imposition of sanctions pursuant to Fed.R.Civ.P. 11.

In opposition to the summary judgment motions, plaintiffs' attorney sought "[t]o eliminate any confusion" as to the nature of plaintiffs' claim of fraud, stating that their central contention was not so much that they were unaware of the flip nature of the transaction but rather "that there never was any 'flip' deal in this matter." (Affidavit of Joseph H. Neiman dated October 16, 1992, ¶ 2.) He stated that plaintiffs contended

> [t]hat Vladimir Bankin never received the $219,000.00 profit that he has claimed to receive and that this scheme was designed to convince all of the plaintiffs that defen-

dants Yekimov and Rachkauskas paid their pro rata share of $989,000.00 (*id.*), leading plaintiffs to believe "that Rachkauskas and Yekimov were paying the same pro rata price [in Riccobono] as everyone else" (*Id.* ¶ 4). In support of their contention that Yekimov and Rachkauskas had bought the building directly from Equities and that the supposed September 20 flip/assignment was a sham, plaintiffs submitted, *inter alia,* a September 11, 1985 check for $15,000 from Rachkauskas to the law firm representing Equities; the "memo" line on this check read: "downpayment for 219 E. 29 St. NY, NY". Plaintiffs also submitted the pertinent page of the municipal plat records listed in the Standard Manhattan Residential Directory for 1988–1989 ("plat directory"), which listed Riccobono as the owner of the building and as having purchased it for $770,000. In addition, Blinov, one of the Group B plaintiffs, submitted an affidavit stating that in the spring of 1991, Bankin telephoned and

> told me . . . that he made no money and in no way was profiting from that deal.
>
> . . . .
>
> 5. He told me even though he stated at the deposition that he made a profit on this deal, in reality he made no profit and that he was just used as a dummy.
>
> 6. Bankin told me that he was put at the closing table by Yekimov, representing somebody who was doing a flip, but in reality he was not.

(Affidavit of Nicholas Blinov dated October 21, 1992, ¶¶ 3–6.)

In a Memorandum and Order dated March 31, 1993 ("Decision"), the district court granted defendants' motions for summary judgment. The court dismissed the securities law claims, stating that, "[e]ven accepting plaintiffs' assertion that they were not on notice as to the flip, . . . this did not directly affect the purchase price plaintiffs paid for their shares." Decision at 11. The court concluded that because the alleged misrepresentations concerned the flip/assignment from Bankin to Yekimov and Rachkauskas rather than the Riccobono shares, the alleged fraud was not connected to, and any misrepresentation was not material to, the purchase of the securities.

The court also found that plaintiffs failed to produce evidence showing that Yekimov and Rachkauskas actually purchased the building for only $770,000, not $989,000:

> Documents submitted by both parties, including the assignment itself, reflect that the $219,000 difference was to be paid to Bankin as an "assignor's fee". Plaintiffs speculate that this payment was never made, but they offer no evidence in support of their position. . . . Because the assignment indicates that the $219,000 was to be paid to Bankin, and because plaintiffs offer no evidence to the contrary, this alleged dispute is not a proper ground for plaintiffs to defeat summary judgment.

*Id.* at 12–13.

The court dismissed plaintiffs' RICO claims, finding that plaintiffs had failed to produce any evidence of pattern or continuity. The court stated in part that

> plaintiffs refer to acts of fraud in connection with New Jersey real estate transactions that do not appear to have anything to do with the transaction at issue in this case, and thus cannot be said to be related to the racketeering activity alleged to have arisen out of the flip transaction.

Decision at 15.

Having dismissed plaintiffs' federal claims, the court declined to exercise pendent jurisdiction over their state-law claims, and it dismissed the latter claims without prejudice. The court denied defendants' motions for sanctions. This appeal and cross-appeal followed.

## II. DISCUSSION

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). When a defendant moving for summary judgment has pointed to the absence of evidence to support an essential element on which the plaintiff has the burden of proof, the plaintiff, in order to avoid summary judgment, must show the presence of a genuine issue by

coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in his favor, to establish the existence of that element at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c).

■■■ In considering a motion for summary judgment, the district court may rely on "any material that would be admissible or usable at trial." 10A C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2721 at 40 (2d ed. 1983). In considering the record before it, however, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, and it may not properly grant summary judgment where the issue turns on the credibility of witnesses. Any assessments of credibility and all choices between available inferences are matters to be left for a jury, not matters to be decided by the court on summary judgment. *See, e.g.,* Fed.R.Civ.P. 56(e), 1963 Advisory Committee Note; *Agosto v. INS,* 436 U.S. 748, 756, 98 S.Ct. 2081, 2086–87, 56 L.Ed.2d 677 (1978); *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 472–73, 82 S.Ct. 486, 490–91, 7 L.Ed.2d 458 (1962); *Centronics Financial Corp. v. El Conquistador Hotel Corp.,* 573 F.2d 779, 782 (2d Cir.1978); 6 *Moore's Federal Practice* ¶ 56.02[10], at 56–45 (2d ed. 1993).

In the present case, we conclude that plaintiffs' response to the summary judgment motions sufficed to reveal genuine issues to be tried as to (a) whether there were misrepresentations, (b) if there were, whether those misrepresentations were material, and (c) whether the actions of the defendants other than Khani constituted a pattern of racketeering activity.

## A. *The Securities Law Claims*

Section 10(b) of the 1934 Act prohibits the use of "any manipulative or deceptive device" in connection with the sale of a security. 15 U.S.C. § 78j(b). Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5(b). The fundamental purpose of the 1934 Act is to implement a "philosophy of full disclosure," *Basic, Inc. v. Levinson,* 485 U.S. 224, 230, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (internal quotes omitted), in order "to make sure that buyers of securities get what they think they are getting," *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). Rule 10b–5 thus makes unlawful any misrepresentation "that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities." *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 860 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

■■■ Liability under Rule 10b–5 may be imposed not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration. *See IIT International Investment Trust v. Cornfeld,* 619 F.2d 909, 927 (2d Cir.1980). For example, accountants have been held to have a "duty to take reasonable steps to correct misstatements they have discovered in previous financial statements on which they know the public is relying," *IIT International Investment Trust v. Cornfeld,* 619 F.2d at 927, and a "lawyer has no privilege to assist in circulating a statement with regard to securities which he knows to be false simply because his client has furnished it to him," *SEC v. Frank,* 388 F.2d 486, 489 (2d Cir.1968).

■ In order to recover under Rule 10b–5, a plaintiff claiming to have bought securities in reliance on misrepresentations of fact must show, *inter alia,* that the statements were made "in connection with" that purchase and were both false and material. *See, e.g., Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 212, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 900 F.2d 576, 581 (2d Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991); *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986). Satisfaction of the "in connection with" element requires only a showing that "a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part." *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d at 943.

■ Materiality is a "mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts." *TSC Industries v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976).

> In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a "reasonable [prospective purchaser or seller]" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.

*Id.* (footnotes omitted). A fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares. *See, e.g., Basic, Inc. v. Levinson,* 485 U.S. at 241, 108 S.Ct. at 988–89; *TSC Industries v. Northway, Inc.,* 426 U.S. at 449, 96 S.Ct. at 2132; *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 166–67 (2d Cir. 1980); *SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 15 (2d Cir.1977). A fraud claim may not properly be dismissed summarily on the ground that the alleged misstatements were not material unless they would have been so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance. *See, e.g., TSC Industries v. Northway, Inc.,* 426 U.S. at 450, 96 S.Ct. at 2133; *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). Representations tending to indicate that the valuation of the shares to be purchased has been inflated may obviously be material. *See, e.g., Mayer v. Oil Field Systems Corp.,* 721 F.2d 59, 66 (2d Cir.1983).

■ The granting of summary judgment dismissing plaintiffs' federal securities law claims in the present case did not comport with these principles. First, the district court ruled that the "in connection with" requirement was not satisfied because the alleged misrepresentation focused on the purported flip/assignment from Bankin to Yekimov and Rachkauskas. This ruling was erroneous because there was an intimate relationship between that supposed transaction and the price plaintiffs paid for their Riccobono shares. Plaintiffs' contentions were (a) that Riccobono was to buy Yekimov and Rachkauskas's right to purchase the building; (b) that Yekimov and Rachkauskas represented they were selling that right to Riccobono for what it cost them; (c) that Yekimov and Rachkauskas represented that that cost was $989,000, *i.e.,* the $770,000 to be paid to Equities plus the $219,000 allegedly paid to Bankin as an assignment fee; and (d) that Yekimov and Rachkauskas represented that they were contributing to Riccobono *pro rata* with plaintiffs. For example, the Group A plaintiffs purchased 30% of the shares of Riccobono for approximately 30% of $989,000 (*i.e.,* $296,700); they say they were led to believe that Yekimov and Rachkauskas were buying the remaining 70% of the Riccobono shares for 70% of $989,000 (*i.e.,* $692,300), whereas instead, since there was no flip/assignment, Yekimov and Rachkauskas's investment in Riccobono was only $473,300 (*i.e.,* $770,000 minus plaintiffs' $296,700 investment). Thus, the representation that there was a flip/assignment was directly connected to the price at which plaintiffs were offered and purchased the Riccobono shares.

The matter of whether or not there was in fact a flip/assignment may be found to have

been material in two respects. First, a rational jury could find that a person considering purchasing shares of a new corporation would think it important to know whether he was paying a disproportionately high price for his shares. Second, the building was Riccobono's only asset, and a rational jury could find that a person considering investing many thousands of dollars in the corporation would be influenced by whether the price that its sole asset commanded in an arm's-length transaction was $989,000, as represented, or only $770,000.

We conclude that plaintiffs made an adequate showing that the claimed misrepresentations were both "in connection with" the purchase of the Riccobono shares and were material.

Further, we think it clear that plaintiffs presented several pieces of evidence sufficient to create a genuine issue to be tried as to whether the representation by Yekimov and Rachkauskas that there was a flip sale was false because Yekimov and Rachkauskas themselves, rather than Bankin, purchased the building from Equities for $770,000, merely feigning the flip/assignment from Bankin. First, plaintiffs presented a copy of the municipal plat directory showing that Riccobono bought the building for $770,000. Though defendants contended that their municipal filings from which this entry in the plat directory was compiled had reported the $770,000 price rather than $989,000 in order "to reduce the conveyance taxes and deed stamps" (Affidavit of Rachkauskas dated July 27, 1992, ¶ 12), a jury would be free to reject this explanation and accept plaintiffs' contention that this showed that there had been no flip/assignment. Second, plaintiffs presented Rachkauskas's canceled check to Equities' attorney; the check was dated September 11, 1985, one day after the purported deal between Equities and Bankin and more than a week before the purported flip/assignment from Bankin to Yekimov and Rachkauskas; and the check itself specified that the sum reflected therein was a "downpayment" on the building. Third, Blinov submitted an affidavit stating that in 1991 Bankin told him (1) that Bankin had acted as a "dummy" for Yekimov and Rachkauskas,

posing as the middleman in an apparent flip transaction that was not in fact a flip, and (2) that Bankin did not receive any money from Yekimov and Rachkauskas in that purported flip transaction, by way of assignment fee or otherwise. Though the statements attributed to Bankin in this affidavit apparently are contrary to Bankin's deposition testimony, they raise credibility issues that cannot properly be resolved on summary judgment. We note that Bankin apparently did not submit his own affidavit, either initially in support of his summary judgment motion or in reply to the assertions in Blinov's affidavit.

Finally, plaintiffs' contention that Bankin was merely an actor whose role was to mask the actual purchase of the building by Yekimov and Rachkauskas directly from Equities for $770,000 finds some support in various sworn statements of Khani. In an affidavit, Khani stated that when he represented Bankin in connection with the September 10 contract of sale, Bankin had been referred to him by Yekimov. In his deposition, Khani further revealed that it was Yekimov, not Bankin, who informed Khani what the terms of that contract were to be, including "the purchase price, the terms of the financing, and also the terms of the purchase money mortgage that was to be taken back." (Deposition of James Khani at 10.) And when Khani represented Bankin at the signing of the September 10 contract, that was the first time he and Bankin had met. (*Id.* at 41.) From the facts that it was Yekimov who arranged to have Khani represent Bankin at the September 10 signing of the initial contract with Equities and that it was Yekimov who gave Khani all of the information with respect to the terms of the sale, together with the facts that after Bankin signed that contract Rachkauskas made an immediate downpayment on the building well before the purported flip/assignment from Bankin and that the plat directory showed Riccobono as having purchased the building for $770,000, a jury could reasonably infer that prior to Bankin's signing the September 10 contract, Yekimov and Rachkauskas had in fact arranged with Equities to acquire the building themselves for $770,000.

We also note that when Khani was explaining at his deposition that he had declined to represent any of the plaintiffs on grounds of conflict of interest, he testified that "Mr. Bankin was assigning his interest to a corporation, that they would be making a profit—so called profit—on the transaction." (*Id.* at 37.) Though when quizzed as to whom he meant by "they," Khani quickly said he meant only Bankin, his reference to "they" was perhaps a slip of the tongue in which a factfinder could find Freudian implications. This evidence, which a rational jury could find suggestive of a fraudulent flip, also could be found to implicate Khani as a knowing participant in a scheme to use Bankin as a straw man in order to conceal the true purchase price.

We conclude that the record revealed sufficient evidence to permit a rational jury, drawing inferences and making credibility assessments in plaintiffs' favor, to find that Yekimov and Rachkauskas falsely represented the cost of the building as $989,000 rather than $770,000, and that plaintiffs relied on that misrepresentation in purchasing Riccobono shares whose price was thus inflated. Summary judgment dismissing plaintiffs' claims under the 1934 Act was inappropriate.

## B. *The RICO Claims*

Section 1962(c) of 18 U.S.C. makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." To establish a civil RICO claim for violation of § 1962(c), a plaintiff must show that he was injured by defendants' " '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.' " *Cullen v. Margiotta,* 811 F.2d 698, 712–13 (2d Cir.) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985)), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). For the reasons below, plaintiffs' RICO claims should not have been summarily dismissed against the defendants other than Khani.

### 1. *Defendants other than Khani*

 All defendants argued that plaintiffs had failed to produce evidence of a pattern of racketeering activity. In order to show such a pattern, a plaintiff must show at least two predicate acts committed in a 10-year period. *See, e.g., H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 237, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989) ("*H.J. Inc.*"); *Cullen v. Margiotta,* 811 F.2d at 713. Further, the predicate acts must be related and reveal continued, or the threat of continued, unlawful conduct:

> A pattern is not formed by sporadic activity, ... and a person cannot be subjected to the sanctions of [RICO] simply for committing two widely separated and isolated criminal offenses.... Instead, the term "pattern" itself requires the showing of a relationship between the predicates, ... and of the threat of continuing activity.... It is this factor of continuity plus relationship which combines to produce a pattern....

*H.J. Inc.,* 492 U.S. at 239, 109 S.Ct. at 2900 (internal quotes omitted). The purpose of the relationship and continuity requirements is to "prevent the application of RICO to the perpetrators of 'isolated' or 'sporadic' criminal acts." *United States v. Indelicato,* 865 F.2d 1370, 1383 (2d Cir.1989) (en banc) (internal quotes omitted).

Relatedness may be established by proof of "criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. at 2901. In *United States v. Indelicato,* we noted that

> [a]n interrelationship between acts, suggesting the existence of a pattern, may be established in a number of ways. These include proof of their temporal proximity, or common goals, or similarity of methods, or repetitions. The degree to which these factors establish a pattern may depend on the degree of proximity, or any similarities in goals or methodology, or the number of repetitions.

865 F.2d at 1382.

Continuity is "both a closed- and open-ended concept, referring either to a closed

period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition," *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. at 2902, and thus may be proved in a variety of ways. For example, "[a] party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* at 242, 109 S.Ct. at 2902. Alternatively, the continuity requirement may be met by demonstrating a threat of continuity, for example, by showing that the defendant operates as part of a long-term association that exists for criminal purposes, or that the predicates are a "regular way of conducting defendant's ongoing legitimate business." *Id.* at 242–43, 109 S.Ct. at 2902.

Here, plaintiffs showed that Yekimov and Rachkauskas sold stock to the Group A plaintiffs in 1985 and that Yekimov or Rachkauskas sold stock to individual Group B plaintiffs at various times during 1986. There thus were a number of sales of securities; according to plaintiffs, each of those sales involved the same fundamental alleged misrepresentation inflating the value of the shares plaintiffs purchased. Further, Yekimov and Rachkauskas transferred their remaining Riccobono shares to defendant Awada Investment Corp. and apparently have been trying to continue to sell those Riccobono shares based on $989,000 as the price of the building. We conclude that, although plaintiffs' allegations of "bogus real estate deals in New Jersey" were not sufficiently specific, the repeated sales of Riccobono shares suffice to permit a jury to find a RICO pattern.

Accordingly, the district court should not have granted summary judgment dismissing the RICO claims against the defendants other than Khani.

### 2. *Khani*

■ Khani made the additional argument that he could not be held liable under RICO because he had merely acted as an attorney for the other individual defendants. On the record in this case, we agree.

In *Reves v. Ernst & Young*, —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) ("*Reves*"), the Supreme Court held that, in order "to conduct or participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs," 18 U.S.C. 1962(c),

> one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required.

*Id.* —— U.S. at ——, 113 S.Ct. at 1170 (footnote omitted) (emphasis in original). The Court thus adopted what it called the " 'operation or management' test," *id.*, stating that one is liable under RICO only if he "participated in the operation or management of the enterprise itself," *id.* —— U.S. at ——, 113 S.Ct. at 1172. An enterprise may be operated, for RICO purposes, by, *inter alios,* upper management, "lower-rung participants in the enterprise who are under the direction of upper management," or "others 'associated with' the enterprise who exert control over it, as for example, by bribery." *Id.* —— U.S. at ——, 113 S.Ct. at 1173. In *Reves*, the Court held that an accounting firm, whose alleged wrongdoing was its failure to inform the plaintiffs of the defendant's financial condition, did not participate in defendant's management or operation and hence was not subject to liability under RICO. *Id.* —— U.S. at —— — ——, 113 S.Ct. at 1173–74.

In the present case, Khani's position is similar to that of the accountants in *Reves.* Khani was alleged to have represented Bankin, Yekimov, and Rachkauskas in most of the transactions here at issue. Khani stated that he acted as no more than their attorney; that he had no role in any of the events prior to having Bankin referred to him as a client for the September 10 contract of sale; and that he had no role in the conception, creation, or execution of the purported flip/assignment from Bankin to Yekimov and Rachkauskas, a document presented to him as a *fait accompli.* Plaintiffs produced nothing to contradict any of these assertions, and they adduced no evidence to show that Khani in any way participated in the management or

direction of a RICO enterprise. Accordingly, although Khani may be subject to liability under the securities laws, *see* Part II.A. above, plaintiffs failed to present evidence of a basis for holding him liable under RICO.

## CONCLUSION

For the foregoing reasons, we vacate the judgment of dismissal except insofar as it dismissed the RICO claims against defendants Khani and Cohen Law Offices, and we remand for proceedings not inconsistent with this opinion. We affirm so much of the judgment as dismissed the RICO claims against defendants Khani and Cohen Law Offices, and we affirm the denial of sanctions.

Costs to plaintiffs.