**Raymond S. RIZZO, Plaintiff,**

v.

**THE MACMANUS GROUP, INC.,** Clarion Marketing & Communications, Inc., Roy Bostock and Craig Brown, Defendants.

**No. 00 Civ. 772(WHP).**

United States District Court, S.D. New York.

March 30, 2001.

Thomas J. Schwarz, Christopher P. Malloy, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, for Plaintiff.

Paul F. Corcoran, John T. Brennan, Davis & Gilbert LLP, New York, New York, for Defendants.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

Plaintiff Raymond S. Rizzo, a former chairman and chief executive officer of Clarion Marketing & Communications, Inc. ("Clarion"), brings this action against Clarion, its privately-held corporate parent, The MacManus Group ("MacManus"), and two senior officers of MacManus, Roy Bostock and Craig Brown, alleging fraud

in connection with the repurchase of his 15,000 shares of MacManus stock at five cents per share as part of a severance agreement. Just weeks after Rizzo's stock redemption, MacManus announced a merger with another company that valued Rizzo's former holdings at $14.8 million. The complaint as against all defendants sets forth claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and under New York law for fraud, breach of fiduciary duty, and negligent misrepresentation. In addition, the complaint sets forth a claim against Bostock and Brown for controlling persons liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Defendants move to dismiss the complaint pursuant to Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure for failure to state a claim and plead with particularity.

### Factual Background

The following facts are drawn from the complaint and documents incorporated by reference into the complaint.

From early 1987 through July 1989, Rizzo held the position of chairman and chief executive officer of Clarion, a marketing consulting firm and wholly owned subsidiary of MacManus, a privately-held advertising and marketing communications holding company. (Compl.¶¶ 1, 14, 31.) Clarion employed Rizzo through a series of three employment agreements, the latest agreement engaging him as chief executive officer through December 31, 2001. (Compl.¶ 14.) Rizzo's employment could not be terminated unless at the direction of the Clarion board of directors "for cause." (Compl.¶ 15.) In connection with his employment, Rizzo acquired 15,000 shares of MacManus stock, redeemable upon his termination or otherwise aliena-ble at a set formula tied to retained earnings. (Compl.¶¶ 18–19.)

Rizzo had a falling out with MacManus's management in 1998. Defendants Bostock, MacManus's chief executive officer, and Brown, its chief operating and financial officer, made known to Rizzo their dissatisfaction with Clarion's financial performance. (Compl.¶¶ 40–41.) As a consequence, Rizzo was replaced by Lance Smith as chief executive officer of Clarion but continued his employment as chairman. (Compl.¶ 21.) Initial attempts in April 1998 to negotiate a severance package failed. (Compl.¶ 42.) In the spring of 1999 Smith, authorized by Bostock and Brown, renewed Clarion's efforts to negotiate with Rizzo and in September of that year presented Rizzo with a severance agreement terminating his employment contract two years early on December 31, 1999 and guaranteeing certain payments and benefits. (Compl.¶¶ 24, 26, 29, 32, 45.) The severance agreement provided that Rizzo's 15,000 shares of MacManus stock would be redeemed for five cents per share, totaling $750. (Compl.¶¶ 4, 25.) The severance agreement also provided that Rizzo would serve as a consultant until December 31, 2000. (Compl.¶ 31.)

In 1998 and 1999, rumors circulated about a possible merger between MacManus and Leo Group, another privately-held advertising and marketing communications company. (Compl.¶ 22.) Bostock repeatedly denied those rumors to the press and internally to Rizzo and other MacManus employees, assuring that MacManus intended to remain private and was not for sale. (Compl.¶¶ 2, 22–23, 27.) In describing Bostock's denials of the rumors, the complaint quotes a portion of a July 16, 1999 article in *Campaign,* a British magazine of limited circulation, that gives superficial treatment to the prospects of MacManus merging or being acquired. (*See*

Compl. ¶ 22; *see also* Ex B. to Decl. of John T. Brennan dated April 14, 2000.) Although cited only as a contextual reference—there is no allegation that Rizzo either read or relied upon the content of the article—defendants use this article as a fulcrum for their motion to dismiss. Thus, it is worth summarizing the salient points of the piece for purposes of the legal discussion to follow.

The article, titled "The Kings of Madison Avenue," featured Bostock and reported on industry speculation that MacManus "is up for a deal" as a result of the relaxation of the conflicts policy of one of its main clients, Proctor & Gamble. Prefaced with the disclaimer that it had "no revelations to report," the article stated that the nearest it "ever got to a scoop" was "a highly promising moment as [Bostock] veered towards talk of 'deal-making within the next three years but not before the end of this one.'" The article touched upon the subject of failed merger discussions in 1998 between MacManus and Leo Group and of future consolidation in the industry. In this regard, it quoted Bostock as saying: "But I think the speculation is far, far ahead of the facts. We've been part of the speculation, with Interpublic, but there have been no discussions between us.... Nope, no, absolutely no discussions, period."

Prior to signing the severance agreement, Rizzo alleges that he discussed with Smith whether MacManus intended to remain a private company. (Compl.¶ 27.) Specifically, Rizzo alleges that he asked Smith about contemplated transactions through 2001, such as the sale of the company, that he should know about before signing the agreement. (Compl.¶ 27.) According to the complaint, Smith replied that he understood based on conversations with Bostock and others that no such transactions were contemplated in the near future. (Compl.¶ 27.) When Rizzo allegedly stated that he nevertheless wanted to meet with Bostock and Brown, Smith told Rizzo not to bother because it "will only hamper negotiations and will serve no need." (Compl.¶ 27.) In response to further questions about the designated stock sale period, which dated back to January 1, 1999, Smith allegedly told Rizzo that he did not believe MacManus "was planning anything that would or should make [him] suspicious about his stock repurchase" and that Brown is "inflexible" on the repurchase date. (Compl.¶ 27.) Smith also allegedly advised Rizzo "not [to] worry about it because they cannot put anything together from nothing before the end of the year." (Compl.¶ 27.)

Rizzo signed the severance agreement on September 30, 1999. (Compl.¶ 27.) On November 3, 1999, MacManus merged with Leo Group. (Compl.¶ 3.) In December 1999, MacManus advised its employee stockholders that the surviving entity of the MacManus–Leo Group merger, called BDM, intended to go public in 2001 and that, in connection with the merger, MacManus would repurchase up to 40% of each employee's stock for $992 per share. (Compl.¶ 4.) As a result of the merger and planned public offering, Rizzo contends that his 15,000 shares of stock are worth in excess of $14.8 million. (Compl.¶ 4.)

Rizzo avers that at the time he was negotiating his severance agreement with Smith, defendants were aware but failed to disclose a number of material, nonpublic facts evidencing that MacManus had reached an advanced stage of its plan to merge or be acquired, or a combination of both, and entered merger discussions with several companies. (Compl.¶¶ 5, 33.) First, Rizzo claims that several months prior to September 30, 1999, MacManus secretly hired Morgan Stanley & Company to advise it on how to structure the compa-

ny to make it a more attractive candidate for merger or acquisition. (Compl. ¶¶ 5, 33.) Second, Rizzo claims that prior to September 30, 1999, MacManus already had been approached by several potential merger partners and had reached an advanced stage of negotiations with the Interpublic Group. (Compl. ¶¶ 5, 34.) Third, it is alleged that by mid-September 1999, Bostock was discussing a potential merger with clients of MacManus to see if they had any objection and was touting the possible merger as a means to induce other employees to remain with the company; specifically, on September 24, 1999, Bostock purportedly told a senior MacManus executive to stay with the company because within six months MacManus would close a deal that Bostock guaranteed would place a value on the executive's stock of at least $600 to $800. (Compl. ¶¶ 5, 35.) Fourth, in late September 1999, Bostock received a call from the chief executive officer of Leo Group who advised Bostock of his company's interest in merging with MacManus. (Compl. ¶¶ 5, 36.)

Penultimately, Rizzo avers that had he been advised of the true facts, he would not have signed the severance agreement and redeemed his stock and, instead, either would have negotiated a higher payment for the stock or remained as an employee for the duration of his term of engagement. (Compl. ¶ 6.) Rizzo submits that defendants defrauded him by misrepresenting that the value of his stock was only five cents per share, by affirmatively advising him that MacManus would not be involved in any substantial corporate transactions in the near future, by failing to correct Bostock's prior statements concerning MacManus's intent to remain private, and by omitting to disclose the negotiations with potential merger partners and acquirors and contemplated public offering. (Compl. ¶ 50.) Rizzo asserts that

defendants acted consciously because they knew of the status of his negotiations with Clarion and failed to disclose material, nonpublic information and, moreover, were motivated by a desire to end his employment without fully compensating him. (Compl. ¶¶ 38–39.)

*Discussion*

On a motion to dismiss pursuant to Rule 12(b)(6), a court typically must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor. *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998). A court should not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995). This Court may consider documents that are incorporated by reference in the pleadings. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 808–09 (2d Cir.1996); *Goldman v. Belden*, 754 F.2d 1059, 1065–66 (2d Cir.1985).

Defendants hotly contest the sufficiency of Rizzo's claims. Defendants assert that the complaint cannot be sustained as a matter of law for the principal reason that the July 1999 article in *Campaign* and Smith's statements about the future status of the company placed Rizzo on notice that MacManus was a likely merger candidate within the time frame of his employment contract and, therefore, negate any alleged misrepresentations or omissions. Apart from materiality, defendants argue that the complaint fails to plead with particularity misrepresentations and omissions as well as the element of scienter as required by Rule 9(b) and the Private Securities

Litigation Reform Act of 1995 ("Reform Act"). Defendants also argue that the complaint fails to plead reasonable reliance.

Rizzo responds that defendants had an affirmative duty to disclose the material, nonpublic information relating to the status of merger negotiations. Rizzo submits that notwithstanding the *Campaign* article, specific information from a corporate insider is not rendered immaterial by nonsubstantive media speculation about merger or sale prospects. Rizzo also contends that the complaint adequately pleads facts sufficient to raise a strong inference of fraudulent intent and to show reasonable reliance.

### I. *Liability Under Section 10(b) Of The Exchange Act And Rule 10b–5 Thereunder*

Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder prohibit fraudulent activity in connection with the purchase or sale of securities. *See* 15 U.S.C.A. § 78j(b) (West 1997); 17 C.F.R. § 240.10b–5 (2000). To state a claim for relief under Rule 10b–5, a plaintiff must plead that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury." *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999). Defendants challenge the complaint on three primary grounds: materiality of the alleged misrepresentations and omissions, the particularity of the allega-

tions of scienter, and the element of reliance.[1]

### A. *Actionable misrepresentations or omissions*

Where a defendant operates under an affirmative duty of disclosure, "silence in connection with the purchase or sale of securities may operate as a fraud actionable under § 10(b)." *Chiarella v. United States*, 445 U.S. 222, 230, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). Relationships that give rise to a duty of disclosure in the commercial context are varied and include circumstances (i) where one party stands in a fiduciary relationship to another; (ii) where one party possesses superior knowledge not available to the other and knows that the other is acting on the basis of mistaken knowledge; and (iii) where a party has made an inaccurate, incomplete or misleading prior disclosure. *See, e.g., Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150–51 (2d Cir.1993); *Vento & Company of New York, LLC v. Metromedia Fiber Network, Inc.*, No. 97 Civ. 7751(JGK), 1999 WL 147732, at *9 (S.D.N.Y. March 18, 1999). Based on the complaint, MacManus and those acting on its behalf had a duty to speak arising from their position vis-a-vis Rizzo. Paramountly, "[c]lose corporations buying their own stock, like knowledgeable insiders of closely held firms buying from outsiders, have a fiduciary duty to disclose material facts." *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 435 (7th Cir.1987). Thus, as pled, MacManus operated under a duty of disclosure to Rizzo when it undertook to repurchase Rizzo's stock in the company. In addition, as pled, defendants Bostock and Brown, as directors and officers of Mac-

---

**1.** While defendants' arguments focus on the claims under Section 10(b) and Rule 10b–5, those claims share common elements with the New York common law claims alleged. Because defendants do not move on independent grounds to dismiss the state law claims, the success of the motion to dismiss the federal securities law claims will determine the sufficiency of the state law claims as well.

Manus, owed a fiduciary duty to Rizzo, as an employee shareholder, to inform him of all material nonpublic facts concerning the value of MacManus stock prior to causing the company to complete the repurchase. *See Powers v. British Vita, P.L.C.,* 57 F.3d 176, 189 (2d Cir.1995) (directors owed fiduciary duty to plaintiff minority shareholder to disclose recapitalization plan that affected value of options issued to plaintiff). To the extent the complaint alleges that defendants had superior knowledge of merger negotiations (*see* Compl. ¶ 70) and that prior disclosures by Bostock had been inaccurate, incomplete or misleading (*see* Compl. ¶¶ 22–23), defendants likewise had a duty to speak and correct prior statements. *See Vento,* 1999 WL 147732, at *10 (superior knowledge held by company and controlling shareholder about corporate transaction created duty to disclose to minority shareholder); *In re Gulf Oil/Cities Serv. Tender Offer Litig.,* 725 F.Supp. 712, 748 (S.D.N.Y.1989) (securities laws may require that previously disclosed statements be corrected when there is "a significant change in a party's attitude toward a merger").

■ In apparent recognition of alleged facts giving rise to such a duty, defendants argue that MacManus in fact did speak and that the company's intent to merge was public information as disseminated through the *Campaign* article or was otherwise made known to Rizzo through Smith. A fact will be considered material within the meaning of Rule 10b–5 if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 448–49, 96 S.Ct. 2126, 48 L.Ed.2d 757

(1976)). The materiality of information is a mixed question of law and fact. *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1466 (2d Cir.1996). "The legal component depends on whether the information is relevant to a given question in light of the controlling" substantive law [and][t]he factual component requires an inference as to whether the information would likely be given weight by a person considering that question. *First Jersey,* 101 F.3d at 1466–67 (citations omitted). Material facts are "those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir.1968) (en banc). They encompass any fact "which in reasonable and objective contemplation might affect the value of the corporation's stock or securities." *Texas Gulf Sulphur,* 401 F.2d at 849. Because materiality is often a fact intensive inquiry, summary adjudication of a Rule 10b–5 claim is not appropriate on the ground that the alleged misstatements or omissions were not material "unless they would have been so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Azrielli v.. Cohen Law Offices,* 21 F.3d 512, 518 (2d Cir.1994).

In the context of mergers, materiality "will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Basic,* 485 U.S. at 238, 108 S.Ct. 978 (quoting *Texas Gulf Sulphur,* 401 F.2d at 849). By adopting the probability/magnitude test, the Supreme Court expressly rejected the approach whereby preliminary merger discussions did not become material until " 'agreement-in-principle' as to the price and structure of the transaction [had] been reached between would be merger part-

ners." *Basic,* 485 U.S. at 233, 108 S.Ct. 978. Further, because a merger is one of the most important events that can occur for a company, insider information regarding a merger "can become material at an earlier stage than would be the case as regards lesser transactions." *Basic,* 485 U.S. at 238, 108 S.Ct. 978 (quoting *SEC v. Geon Indus., Inc.,* 531 F.2d 39, 47 (2d Cir.1976)). Significantly, "where information regarding a merger originates from an insider, the information, even if not detailed, 'takes on an added charge just because it is inside information.'" *SEC v. Mayhew,* 121 F.3d 44, 52 (2d Cir.1997) (quoting *Geon,* 531 F.2d at 48).

When measured against those controlling standards, Rizzo's complaint, without question, pleads actionable omissions under Rule 10b–5. Factors such as "board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries" may serve as indicia of the probability that a merger will occur. *Basic,* 485 U.S. at 239, 108 S.Ct. 978. The complaint here alleges that defendants failed to inform Rizzo at the time he was preparing to sign the severance agreement that MacManus (i) secretly had hired Morgan Stanley to advise it on how to structure the company to make it more attractive for a merger or acquisition (Compl.¶ 33); (ii) had been approached by several companies interested in merging (Compl.¶ 34); (iii) was discussing with clients their possible objections to a potential merger (Compl.¶ 35); and (iv) had reached an advanced stage of negotiations with Interpublic Group and had commenced top-level discussions with Leo Group (Compl.¶¶ 34, 36). The strong inference from those alleged facts is that by late September 1999, the probability of MacManus completing a merger was high.

In fact, for pleading purposes, defendants' awareness of the probability and magnitude of the prospective transaction is demonstrated by the allegation that Bostock—at about the same time Rizzo prepared to sign the severance agreement—told another senior MacManus executive who was planning to leave that he should stay with MacManus because the company would close a deal which would enhance the value of the executive's stock to $600 to $800 per share. (Compl.¶ 35.) In short, there is a substantial likelihood that a reasonable stockholder would consider the alleged merger negotiations and the anticipated impact on the stock's price in making the decision as to whether to sell and at what price. *See Vento,* 1999 WL 147732, at *10.

Given the materiality of the information allegedly withheld from Rizzo, the affirmative misrepresentations charged in the complaint also must be adjudged actionable. Thus, the alleged representations regarding the value of Rizzo's stock and that MacManus would not be involved in any major transactions in the near future may support liability in light of the omissions regarding the ongoing merger negotiations. The same can be said for defendants' purported failure to correct Bostock's prior statements about MacManus's intent to remain a private company and that the company was not for sale. Disclosure of accurate facts may have been likely to alter the total mix of information available to the reasonable investor.

■ Defendants' core argument is that the July 1999 *Campaign* article postdated Bostock's statements about MacManus remaining private, functioned as an intervening disclosure to Rizzo, obviated the duty to disclose the ongoing merger negotiations, and thereby relieves them of liability. This argument lacks merit.

There is no allegation in the complaint that Rizzo read or learned about the article before he signed the severance agree-

ment. Even making the counterfactual (as alleged) assumption that Rizzo read the article and was fully familiar with industry rumors about MacManus's merger prospects before signing the agreement does not advance defendants' argument. As a temporal matter, defendants ignore the allegations in the complaint that Bostock repeatedly denied the rumors of a merger to MacManus employees and told Rizzo and others that MacManus intended to remain private, even after the article appeared. (Compl. ¶ 23; *see also* Compl. ¶¶ 2, 22, 27.)

As a substantive matter, the article reports only rumors and surmise about the prospects of industry consolidation in general and of a merger by MacManus as a result of changes in Proctor & Gamble's conflicts policy. As the Second Circuit consistently has held, specific factual information from corporate insiders about a potential merger is not rendered immaterial by speculation or brief mention in the press. *See Mayhew*, 121 F.3d at 50–52 (holding that despite rumors in the press that Rorer Group Inc. was a takeover or merger candidate and was conducting talks with three companies, defendant tippee was made privy to material insider information that "went beyond that which has been publicly disseminated" including confirmation that Rorer was in serious merger negotiations); *United States v. Mylett*, 97 F.3d 663, 665–67 (2d Cir.1996) (holding that notwithstanding reports in the *Wall Street Journal* that a transaction between AT & T and NCR was under negotiation, defendant tippee received material insider information that "indicated a much higher level of probability than was publicly available"). Likewise, here, the allegedly withheld insider information would have transformed the likelihood of a MacManus merger from mere possibility at some time in the future to one that was highly probable quite soon. *See Mayhew*, 121 F.3d at 51; *Geon*, 531 F.2d at 49. The

medium sometimes is the message. *See* Marshall McLuhan, *Understanding Media* (1964).

Neither can defendants find shelter in Smith's responses to Rizzo's inquiries about future corporate transactions involving MacManus. The notion that Smith's statement to Rizzo that MacManus could not put "anything together from nothing before the end of the year" cures the failure to disclose stretches the norms of communication beyond acceptable limits. As alleged, Smith's statement effectively amounted to a flat denial, especially given the averment that MacManus was doing more than "nothing" with respect to its status as a privately-held company.

■ Defendants' further objection that the complaint fails to plead with sufficient particularity under Rule 9(b) and the applicable provisions of the Reform Act also lack merit. Rule 9(b) provides that "the circumstances constituting fraud . . . should be stated with particularity." Fed. R.Civ.P. 9(b). The Reform Act requires that in a private securities fraud action, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C.A. § 78u–4(b)(1) (West 1997).

Here, Rizzo alleges that in the context of severing his relationship with Clarion, the two most senior officers of MacManus, through the chief executive of Clarion, sought to end Rizzo's employment without fully compensating him for his holdings of MacManus stock while possessing insider information of a probable and significant corporate transaction. By contractual arrangement, Clarion sought, and did, repurchase Rizzo's stock for five cents a share with knowledge that a probable merger

and plans to go public would increase greatly the value of Rizzo's holdings. The complaint pleads that Rizzo executed the severance agreement only after assurances in face-to-face discussions that no change in the company's status would occur in the near future. In support of those allegations, Rizzo specified facts giving rise to a duty to disclose, the particular factual omissions and misrepresentations allegedly made by defendants, and allegations establishing the reasons why the omissions and representations were misleading or false. Notably, the certainty and vigor with which defendants attack the substance of the complaint is incompatible with their particularity argument. By *a fortiori* reasoning, it confirms that they have been given adequate notice of the details underlying the allegations of fraud in the complaint.

### B. *Sufficiency of scienter allegations*

■ Defendants next assert that the complaint fails to adequately plead scienter with the particularity demanded by the Reform Act. The Reform Act heightened the requirements for pleading scienter to conform with the standards adopted by the Second Circuit. *See Novak v. Kasaks,* 216 F.3d 300, 310 (2d Cir.2000); *Press,* 166 F.3d at 537–38. The relevant provision of the Reform Act provides that a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.A. § 78u–4(b)(2). *Cf. Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995) (in a pre-Reform Act case, articulating the Second Circuit standard as one where a plaintiff "must allege facts that give rise to a strong inference of fraudulent intent").

A plaintiff cannot plead scienter based on speculation or conclusory allegations. A strong inference of scienter may arise where a plaintiff alleges either (i) facts showing that defendants had both motive and opportunity to commit fraud or (ii) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *Rothman v. Gregor,* 220 F.3d 81, 90 (2d Cir.2000); *Novak,* 216 F.3d at 307–08. Accordingly, as the Second Circuit recently explained, the required inference of fraudulent intent arises where the complaint alleges that the defendants: "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Novak,* 216 F.3d at 311.

The complaint establishes scienter for pleading purposes through its allegations of conscious misbehavior and recklessness. That defendants allegedly knew but concealed material information from Rizzo about MacManus's merger prospects in connection with negotiating the severance agreement—while making selective disclosure to other executives who expressed their intent to leave—is sufficient to allege scienter. As the Second Circuit recently reaffirmed, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak,* 216 F.3d at 308; *accord Powers,* 57 F.3d at 188–89 (defendants' failure to disclose recapitalization program despite plaintiff's "clear interest ... is sufficient conscious behavior to give rise to an inference of fraudulent intent"); *Vento,* 1999 WL 147732, at *6–7 (allegations that plaintiff sold his shares only after false assurances that the company was not planning any significant transactions sufficient to plead scienter).

### C. *Reasonable reliance*

Defendants further argue that Rizzo unreasonably relied on Smith's statements

about the plan of MacManus to merge or remain private because, through minimal diligence, he could have learned the truth. *See Hunt v. Alliance North Am. Gov't Income Trust, Inc.,* 159 F.3d 723, 730 (2d Cir.1998); *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 739 (2d Cir.1984). Specifically, defendants assert that Rizzo, despite being strongly discouraged by Smith from making additional inquiries of Bostock and Brown about future deals involving MacManus, should have disregarded Smith and inquired in any event. This argument at best presents an issue of fact and thus is misplaced on a motion to dismiss. This is even more the case given the allegations that Smith was charged by Bostock and Brown to negotiate and sign documents relating to Rizzo's employment on behalf of both MacManus and Clarion (Compl.¶ 28), that Smith kept Bostock and Brown apprised of the progress of the negotiations and received approval of all steps from them (Compl.¶ 27), and that Smith responded to Rizzo's queries "based on conversations with Bostock" (Compl.¶ 27).

\* \* \* \* \* \*

Accordingly, because the complaint adequately pleads actionable misrepresentations and omissions, scienter and reliance, defendants' motion to dismiss the claims brought pursuant to Section 10(b) and Rule 10b–5 is denied.

## II. *Liability Under Section 20(a) Of The Exchange Act*

Defendants also move to dismiss the complaint's Section 20(a) claim against Bostock and Brown for liability as controlling persons. *See* 15 U.S.C.A. § 78t(a) (West 1997). To make out a prima facie case of controlling person liability, a plaintiff must show "a primary violation by the controlled person and control of the primary violator by the targeted defendants, and show that the controlling person was 'in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.'" *First Jersey,* 101 F.3d at 1472 (citations omitted). Because Rizzo's Rule 10b–5 claims withstand defendants' motion to dismiss and defendants assert no independent basis to challenge the Section 20(a) claim at this stage, this Court denies defendants' motion to dismiss the Section 20(a) claim as well.

### Conclusion

For the reasons stated above, defendants' motion to dismiss the complaint is denied in its entirety. Counsel are directed to appear for a pretrial conference on April 20, 2001 at 9:15 a.m.