Shapiro v Rockville Country Club (2004 NY Slip Op 50079(U))

BODY {
font-family : "Times New Roman", Times, serif;
font-size : larger;
}

P {
line-height: 150%;
text-indent: 2em
}

[*1]

Shapiro v Rockville Country Club

2004 NY Slip Op 50079(U)

Decided on February 23, 2004

Supreme Court, Nassau County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 23, 2004

Supreme Court, Nassau County
RAYMOND SHAPIRO, FLORENCE SIEGEL, RUTH GREENBERG, JOAN PETER, THOMAS W. HAYES, ROBERT HUBER and BETTY ANN MARSHALL, Shareholders in ROCKVILLE COUNTRY CLUB, INC. Suing in the right of ROCKVILLE COUNTRY CLUB, INC., Plaintiffs,
againstROCKVILLE COUNTRY CLUB, INC., ROCKVILLE LINKS CORPORATION, WALTER JOSIAH, ROBERT MATTHEWS, ANTHONY MAURO, JAMES GOMIELA, JACK TANNENBAUM, ANTHONY ZOTOLLO, ROBERT MICELI, DONALD RUNACRES, PATRICK LERZA, PETER MILLER, EUGENE CARDOZA, JAMES GEMINO, STEVEN SMITH, EDWARD PATERNOSTRO, NICHOLAS BALZANO, DANIEL LENNON, PATRICK LAGUDI, EDWARD ROGER, GERRY MARCOUX and PETER DORAN, Defendants.
INDEX NO. 15308-02

COUNSEL FOR PLAINTIFFS
Roosevelt, Benowich & Lewis, LLP, 1025 Westchester Avenue, White Plains, New York 10604
COUNSEL FOR DEFENDANTS
(for all Defendants except Gerry Marcoux and Rockville Links Corp.)
Cullen & Dykman, LLP, 100 Quentin Roosevelt Boulevard, Garden City, New York 11530-4850
(for Rockville Links Corp.)
Matthews & Matthews, Esqs., 191 New York Avenue, Huntington, New York 11743


LEONARD B. AUSTIN, J.
Plaintiffs move for summary judgment on the issue of liability on the first, second and third causes of action of their second amended complaint and for leave to amend the caption to add additional Defendants.
Defendant Rockville Country Club, Inc., and the individual Defendants (except Gerry Marcoux [FN1]) move for summary judgment dismissing the complaint or, alternatively, for an order pursuant to CPLR 3211(a)(7) dismissing the action against Defendants Edward Paternostro and Patrick Lagudi.
Defendant Rockville Links Corporation moves for summary judgment dismissing this action.
BACKGROUND
[*2]Plaintiffs are shareholders in Defendant Rockville County Club, Inc. ("Country Club"). Their second amended complaint alleges four causes of action. The first cause of action is a shareholder derivative action seeking to recover damages from the directors of Country Club alleging that they have breached their fiduciary duties to the shareholders. The second cause of action alleges that the directors of Defendant Rockville Links Corporation ("Links") have conspired with, and aided and abetted in, the directors of Country Club's breach of their fiduciary duty. The third cause of action seeks the judicial dissolution of County Club. The fourth cause of action seeks damages, an injunction and attorney's fees alleging a violation of the New York Security Takeover Disclosure Act, Business Corporation Law Article 16.
Country Club is a domestic corporation which was incorporated in 1923. Country Club's primary asset is 106 acres of real property; 3 acres of which are located in the Incorporated Village of Rockville Centre and the remaining 103 acres of which are located in an unincorporated portion of the Town of Hempstead. This property is zoned residential. The property is improved with an 18 hole golf course, a clubhouse, a pool and other facilities used in connection with the operation of a private golf and country club.
Links is a type A not-for-profit corporation which was incorporated in 1958. Links was formed at the direction of the directors of Country Club. Although the exact purpose for Links' incorporation is no longer clear, the parties believe that Links was formed to address certain excise tax issues arising from Country Club's operation. In this way, appropriate licenses could be obtained to serve and sell alcoholic beverages on the premises.
Country Club leased the real property and the structures thereon to Links by a lease dated January 20, 1959. Pursuant to the terms of the lease, Links was to pay an annual rent of $3,000.00 along with the interest payments on Country Club's mortgage on the property, interest on any debentures issued by Country Club, real estate taxes, special assessments, premiums on all insurance policies covering the premises and depreciation. The lease obligates Links to maintain the golf course, the clubhouse, the pool and the other structures located on the premises.
The lease has been renewed on the same terms each year since its inception. The only significant change in the lease since its original execution occurred in 1965 when the annual base rent was raised from $3,000.00 to $7,200.00. The renewal of the Links lease, as amended, has thereafter been approved annually by the directors of Country Club.
Links operates on a fiscal year of March 1 through February 28. Links' payments of real property taxes, maintenance, insurance premiums have increased from $435,733 in 1992 to $689,411.00 in 2003. In addition, Links makes the payments on a $2.6 million mortgage, which is secured by the property. That mortgage was entered into in 1999. The proceeds of this loan were used to improve the clubhouse. The improvements made to the clubhouse and the other facilities on the premises will revert to County Club when the lease is terminated.
Over the past several years, Links has not actually paid Country Club the annual rent of $7,200.00. In lieu of rent, Links has provided services to Country Club, such as providing meals to the directors of Country Club for board of directors meetings and paying the fees of Country Club's accountants. Links asserts that the value of these payments or services is in excess of $7,200.00 annually.
In 2002, after the commencement of this action, the directors of Country Club presented the proposed renewal of the Links lease for the year 2003 to Country Club's shareholders who overwhelmingly approved the renewal of the lease. Thereafter, the directors of Country Club [*3]also presented the proposed renewal of the Links lease for the year 2004. Country Club's shareholders again overwhelmingly approved the renewal.
Country Club is authorized to issue 500 shares of common stock. At the present time, 272 shares are owned by individuals who are members of Links; 120 shares are owned by persons who are not members of Links; and 108 shares are owned by Links.
Plaintiffs are individuals who own shares of Country Club but who are not presently members of Links. Not all members of Links are shareholders of Country Club. Links members who are shareholders in Country Club pay reduced dues and fees to Links.
Although Country Club has been incorporated for more than 80 years, it has never paid a dividend nor has it made a distribution to any of its shareholders. A 1930 amendment to the Country Club's Certificate of Incorporation provided that its purpose would be to own construct and operate a golf course and other facilities related to a country club and to promote golf and other athletic interests.
The genesis of this action can be found in demands made by the Plaintiffs Raymond Shapiro, Florence Siegel and Ruth Greenberg (collectively "Shapiro Plaintiffs" or "Shapiro") upon the directors of Country Club in a letter dated October 1, 2001. These Plaintiffs collectively own one share of Country Club which they inherited from their father, Jacob Shapiro, who died in 1957.
The Shapiro Plaintiffs have never been members of Links. Although Jacob Shapiro was entitled to full membership in Country Club in 1925, he chose not to become a member at that time and, in fact, never became a member of Country Club.
The Shapiro Plaintiffs' October 1, 2001 letter demanded that the directors of Country Club terminate the lease between Links and Country Club. They also sought to have Country Club's directors commence suit against those directors of Country Club who voted to enter into and/or renew the Links lease without payment of a fair market rent; to refuse to enter into any lease for the real property except for a fair market rent; to commence suit against all officers and/or directors of Country Club for their failure to realize a reasonable profit on the property; to discontinue the use of Country Club property to secure the obligations and debts of Links; and to take steps to offer the property for sale.
The demands made in Shapiro's October 1, 2001 letter were considered and rejected by Country Club's board of directors at a meeting held on January 23, 2002.
After Country Club's directors rejected Shapiro's demands, this action was commenced.
Plaintiffs assert that the annual renewal of the Links lease by the directors of Country Club constitutes waste of corporate property and, in turn, a breach of their fiduciary duty since the rent paid above the operating expenses on the property does not constitute a fair market rental for the property. Plaintiffs' primary argument is that even though the property is worth at least $40 million, it is leased to Links for $7,200.00 a year a return of 1/50th of one percent per annum.
Over the years, the boards of directors of Links and Country Club have had some overlap. However, a majority of the directors of Country Club are not directors of Links and a majority of the directors of Links are not directors of Country Club. Although all of the current directors of Country Club are members of Links, there is nothing in the Certificate of Incorporation or By-Laws of Country Club which would prevent shareholders of Country Club who are not members of Links from being elected to and serving on Country Club's board.
[*4]Over the years, a majority of the directors of Country Club who are not directors of Links have voted to approve the renewal of the Links lease.
Plaintiffs assert that the rent is set at an artificially low amount to benefit the members of Links to the disadvantage of the owners of Country Club stock who are not members of Links. They assert that this action has resulted in Links establishing an unreasonably low dues and fee structure.
Plaintiffs further allege that the actions of the directors of Country Club have, by design, prevented the sale of shares of Country Club and to keep the value of those shares artificially low. Over the past 35 years, the market price of a share of Country Club has varied between $3,000.00 and $6,000.00. Most recently, shares of Country Club have sold for between $3,000.00 and $3,500.00.
In the 1970's and 1980's, Links established a fund to purchase shares of Country Club from individuals who owned shares of Country Club but did not belong to Links. As recently as 1995, Links sought to purchase shares of Country Club from Country Club stockholders who were not members of Links.
Plaintiffs allege that Country Club sold 10 shares of treasury stock to Links for $3,000.00 per share. The money raised by the sale of these treasury shares was used to cover the cost of legal fees incurred by Country Club in the defense of this action. The shares were sold rather than increasing the rent payments or considering any other method for raising this money. Plaintiffs allege that this action has the effect of diluting their interest in Country Club and further reducing the value of their shares in Country Club.
DISCUSSION
A. Summary Judgment - Legal Standard
Summary judgment is a drastic remedy which will be granted only when it is clear that there are no triable issues of fact. Alvarez v. Prospect Hosp., 68 N.Y.2d 320 (1986); and Andre v. Pomeroy, 35 N.Y.2d 361 (1974). See also, Akseizer v. Kramer, 265 A.D.2d 365 (2nd Dept., 1999). The party moving for summary judgment must make a prima facie showing of entitlement to judgment as a matter of law. Zuckerman v. City of New York, 49 N.Y.2d 557 (1980). Once the party seeking summary judgment has made a prima facie showing of entitlement to judgment as a matter of law, the opposing party must come forward with proof, in evidentiary form, establishing that triable issues of fact exist or demonstrate an acceptable excuse for its failure to do so. Zuckerman v. City of New York, supra; Davenport v. County of Nassau, 279 A.D.2d 497 (2nd Dept., 2001); and Bras v. Atlas Construction Corp., 166 A.D.2d 401 (2nd Dept., 1991).
The party seeking summary judgment must clearly establish to the court that there are no triable issues of fact. Leo v. Gugliotta, 212 A.D.2d 761 (2nd Dept., 1995); and Daliendo v. Johnson, 147 A.D.2d 312 (2nd Dept., 1987). Summary judgment should be denied if there is any doubt as to the existence of a triable issue of fact. Freese v. Schwartz, 203 A.D.2d 513 (2nd Dept., 1994); and Miceli v. Purex Corp., 84 A.D.2d 562 (2nd Dept., 1984).
When deciding a motion for summary judgment, the court must view the evidence in a light most favorable to the non-moving party and must give that party all of the reasonable inferences which can be drawn from the evidence. Negri v. Stop & Shop, Inc., 65 N.Y.2d 625 (1985). See also, Louniakov v. M.R.O.D. Realty Corp., 282 A.D.2d 657 (2nd Dept., 2001)
B. Dissolution of Rockville Country Club, Inc.
The court may direct the dissolution of a corporation on the petition of minority [*5]shareholders if the directors or those in control of the corporation are looting the corporate assets to enrich themselves at the expense of the minority shareholders; continuing the corporation solely to benefit those in control; or that the actions of the directors or those in control has been calculated to depress the capital of the corporation in order to coerce the minority shareholders to sell their stock at a depressed price. Liebert v. Clapp, 13 N.Y.2d 313 (1963); Kruger v. Gerth, 22 A.D.2d 916 (2nd Dept., 1964); and Horne v. Radiological Health Services, P.C., 83 Misc.2d 446
(Sup Ct. Suffolk Co., 1975), aff'd., 51 A.D.2d 544 (2nd Dept., 1976). See also, Matter of Kemp & Beatley (Gardstein), 64 N.Y. 2d 63 (1984); and Fedele v. Seybert, 250 A.D. 2d 519 (1st Dept. 1998).
The proof required to establish a common law dissolution is greater than is required to sustain a shareholder derivative action for waste. Liebert v. Clapp, supra. See also, Fontheim v. Walker, 282 A.D. 373 (1st Dept., 1953), aff'd., 306 N.Y. 926 (1954).
In this case, there is no evidence that the directors or those in control of the corporation have looted the assets of the corporation for their own personal benefit. The primary asset of Country Club is the real property that it leases to Links. There is no evidence that the directors of Country Club have done anything to impair or reduce the value of that property. In fact, even the Plaintiffs admit that, the value of the real property has significantly increased over the years.
There is also no evidence that the directors of Country Club have continued the corporation solely for the benefit of those in control. Plaintiffs have failed to establish that those in control of Country Club have any ulterior motive in continuing the existence of Country Club. The property has always been used as a private golf and country club.
The evidentiary submissions reflect a significant disagreement between the Country Club board and a majority of its shareholders, on the one hand, and a small minority of those who are shareholders of Country Club but not members of Links, on the other, regarding the rent to be charged to Links for the property and the best use thereof. In essence, the Plaintiffs want the property, which has significant value, to be sold and the shareholders to be paid their equity.
The governance of a corporation remains with the shareholders. Their decisions cannot be circumvented unless there is evidence that the majority has assumed an unfair advantage over the minority and the actions of the majority "... is dictated by consideration other than the welfare of the corporation and stockholders as a whole." Horne v. Radiological Health Services, P.C., supra at 378. There has been no such showing in this case. In fact, the shareholders of Country Club have overwhelmingly approved the renewal of the Links lease for the years 2003 and 2004. Indeed, the directors and shareholders of Country Club have been true to the stated purpose of the corporation.
Finally, there is no evidence that the actions of the directors have been calculated to impair the value of the capital stock so as to coerce the minority shareholders to sell their shares at a depressed or deflated price. The parties have a significant disagreement regarding the value of the shares and the price at which they should be sold. However, the market for the shares is equal for all shareholders. That is, Plaintiffs could sell their shares at the same price at which those shares could be sold by all other shareholders. Nor is there any evidence that any effort has been made to compel the Plaintiffs to sell their shares. Finally, there is no evidence that the Plaintiffs have been prevented from selling their shares to third parties at a mutually agreed upon price. See, Kruger v. Gerth, supra. Indeed, Plaintiffs can sell their shares, without limitation, at whatever price the market will bear.
[*6]Viewing the evidence in a light most favorable to the Plaintiffs, and affording them all of the reasonable inferences which can be drawn from the evidence, Plaintiffs have failed to present evidence which would compel a dissolution of Country Club. See, Leibert v. Clapp, supra; and Horne v. Radiological Health Services, P.C., supra. See also, Matter of Sternberg, 181 A.D.2d 897 (2nd Dept., 1992), where the Appellate Division held that a common law dissolution could be obtained only upon a showing of looting of the corporation and a breach of fiduciary duty. See also, Fedele v. Seybert, supra. For these reasons, Plaintiffs motion for summary judgment on their third cause of action must be denied and Country Club's motion to dismiss the third cause of action granted.
C. Violation of New York Security Takeover Disclosure Act
1.Applicable Law
Business Corporation Law ("BCL") §1602 requires that an offerer making a takeover bid file, with the Attorney General and the target company, a registration statement containing the information set forth in BCL §1603.
Business Corporation Law §1601(a) defines "takeover bid" as:
"'Takeover bid' means the acquisition of or offer to acquire by an offerer from an offeree, pursuant to a tender offer or request or invitation for tenders, any equity security of a target company, if after acquisition thereof the offerer woulddirectly or indirectly, be a beneficial owner of more than five percent of any class of the issued and outstanding equity securities of such target company."
Business Corporation Law §1601(b) defines "offerer" as:
"'Offeror' means a person who makes, or in any way participates or aids in making a takeover bid, and includes persons acting jointly or in concert, or who intend to exercise jointly or in concert any voting rights attached to the securities for which such takeover bid is made. An "offerer" includes an issuer of securities whose securities are to be the subject of a takeover bid whether or not the issuer, upon acquisition, will be come the beneficial owner of such securities..."
Business Corporation Law §1601 defines "offeree" as "the beneficial owner, residing in this state, of securities which an offeror acquires or offers to acquire in connection with a takeover bid."
Black's Law Dictionary 7th Edition (1999) defines "takeover bid", at page 1466, as
"an attempt by outsiders to wrest control from the incumbent management of a target corporation." The Black's Law Dictionary definition has been adopted by the various courts in determining whether a proposed stock purchase constitutes a "takeover bid" for the purposes of the Security Takeover Disclosure Act. See, e.g., Matter of Presper, A.D.2 , 765 N.Y.S.2d 210 (Sup. Ct., Monroe Co., 2003).
Although BCL §1601(a) uses the term "tender offer", that term is not defined by the statute. When a term used in a statute is not defined by the statute, that term is to be given its usual and customary meaning. Statutes §94. Black's Law Dictionary, at page 1480, defines "tender offer" as:
"A public offer to buy a minimum number of shares directly from a corporation's shareholders at a fixed price, usu. at a substantial premium over the market price, in an effort to take control of [*7]the corporation."
Business Corporation Law §1613 permits an "...offeree whose equity securities are subject of a takeover bid and who has been injured by any violation of this article to
bring an action...to enjoin any unlawful act or practice and to recover actual damages and reasonable attorneys fees."
2.The Alleged Takeover Bid
Plaintiffs assert that a April 25, 1995 letter from the directors of Links and/or a March 13, 2001 letter from Walter Josiah, President of County Club, to those individuals who are shareholders of Country Club but not members of Links constitute a "takeover bid" for the purposes of the Security Takeover Disclosure Act. This Court disagrees.
The April 25, 1995 does not constitute a "takeover bid" for the purposes of the Security Takeover Disclosure Act. The letter specifically states that it is "...not an offer to buy shares." The letter was directed only to those shareholders of Country Club who had previously expressed a desire to sell their shares. The letter further indicates that there was a limited amount of money available to purchase shares. The shares that would be purchased would be those offered for sale at the lowest purchase price less than $6,000.00 per share.
Thus, the April 25, 1995 Links letter does not constitute a "tender offer" for the purposes of the Security Takeover Disclosure Act since it was not a general offer to all shareholders of Country Club. While the maximum price of a share was set at $6,000.00, any offer to sell shares below that price would be considered. Links offered to purchase those shares offered at the lowest price. The number of shares Links could purchase was dependent upon the willingness of shareholders to sell their shares for $6,000.00 or less. In addition, the price Links would pay for these shares was to be established by the offerees.
The April 25, 1995 letter cannot, therefore, be construed as an offer to purchase a minimum number of shares at a fixed price. Indeed, it most certainly was not an offer to purchase those shares at a substantial premium over market value. It was, at most, an offer to purchase a limited number of shares at or below the market price. At the time that this offer was made, shares of Country Club were selling for between $3,000.00 to $6,000.00 per share. Since Links only had $40,000.00 available to purchase shares, this sum could be used to purchase, at most, 13 shares of Country Club which is significantly less than that which would be needed to give Links control over Country Club.
The same is true as to Walter Josiah's letter of March 13, 2001. This letter indicates that the Country Club was looking into "...establishing a program for the purchase of shares of inactive members." The letter further stated that it should not be construed as "...an offer to purchase your shares." This letter was nothing more than inquiry on the part of the Country Club to determine whether any of the shareholders of Country Club who are not members of Links would be interested in selling their shares. The letter does not set forth any terms which could conceivably be considered an offer to purchase such shares. It fails to set forth any of the terms for the purchase of the stock such as the price, the date by which the offer is to be accepted, the date upon which the offer is to expire, the number of shares to be purchased or any other relevant term which would head a reasonable shareholder to believe an offer to purchase his/her shares was then being made. See, Salant Acquisition Corp. v. Manhattan Industries, Inc., 682 F.Supp. 199 (SDNY 1988).
[*8]The Security Takeover Disclosure Act requires that notice of the terms of the takeover bid be given to offerees who are, by definition, limited to shareholders residing in New York. BCL §§1601(c) and 1602(b). It is unclear as to how many shareholders of Country Club reside outside of the New York and whether the April 25, 1995 and Josiah letters were sent to those individuals.
Even if the Court were to construe these letters to constitute a takeover offer, notice of the proposed purchase would not have to be given to those shareholders who reside outside of New York. Only offerees, as defined by the statute, may maintain an action to enjoin its violation or to recover damages. To the extent that any of the Plaintiffs reside outside of New York, they lack standing to maintain this cause of action.
For the foregoing reasons, this Court concludes that there has not been a takeover bid by Country Club, as defined by the Security Takeover Disclosure Act. Therefore, Defendants' motions to dismiss Plaintiffs' fourth cause of action must be granted.
D. De Facto Merger
While Plaintiffs assert that the actions of Links and Country Club constitute a de facto merger of the corporations, Plaintiffs have not alleged a cause of action pursuant to Business Corporation Law §623 seeking a valuation of their shares as minority shareholders who opposed the proposed merger. The suggestion that Links and Country Club merge or have merged does not give rise to the right to obtain judicial determination of the value of their shares. Such a right only arises upon the actual merger of the corporations. Goldberg v. Arrow Electronics, Inc., 42 A.D.2d 890 (1st Dept., 1973), app. dism., 33 N.Y.2d 1004 (1974); and BCL § 623(e),(g) and(h).
Since Links and Country Club have not merged and have taken no action to effectuate a merger, this claim must also be dismissed.
E. Breach of Fiduciary Duty
1.Standard - Business Judgment Rule
Plaintiffs move for summary judgment on their first cause of action asserting that the directors of Country Club breached their fiduciary duty to the shareholders as a matter of law. They assert that the repeated renewal of the Links lease at what is alleged to be an unreasonably low rent, the sale of treasury shares of Country Club to finance their defense of this action, the failure to collect the rent payable by Links, the artificial depression of the value of Country Club stock and the guaranteeing of Links debt constitute a per se waste of corporate assets.
The directors of a corporation must treat all shareholders majority and minority fairly. Alpert v. 28 Williams St. Corp.,63 NY2d 557, 568 (1984). See also, Tierno v. Puglisi, 279 A.D.2d 836 (3rd Dept., 2001); and Aronson v. Crane, 145 A.D.2d 455 (2nd Dept., 1988). Corporate directors must act with candor, prudence, fairness, morality and honesty of purpose and they must exercise good judgment in the management of the corporation. See, Alpert v. 28 Williams St. Corp., supra at 568, where the Court of Appeals held:
"Because the power to manage the affairs of a corporation is vested in the directors and the majority shareholders, they are cast in the fiduciary role of 'guardians of the corporate welfare.' (citations omitted) In this position of trust, they have an obligation to all shareholders to adhere to fiduciary standards of conduct and to exercise their responsibilities in good faith when undertaking corporate action..."
A claim for breach of fiduciary duty is established by proof that the directors failed to treat all stockholders fairly and evenly. Aronson v. Crane, supra; and Matter of Kemp & [*9]Beatley (Gardstein), supra.
Ordinarily, the actions of directors are protected by the business judgment rule.
This rule "bars judicial inquiry into actions or corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." Auerbach v. Bennett, 47 N.Y.2d 619, 629 (1979). See also, Pollitz v. Wabash R.R. Co., 207 N.Y. 113 (1912) where the Court of Appeals held at page 124:
"Questions of policy management, expediency of contracts or action, adequacy of consideration, lawful appropriation of corporate funds to advance corporate interests, are left solely to their honest and unselfish decision, for their powers therein are without limitation and free from restraint, and the exercise of them for the common and general interests of the corporation may not be questioned, although the results show that what they did was unwise or inexpedient."
Thus, the business judgment rule is necessary to a avoid judicial second-guessing of corporate decisions and provides protection where a decision is made in good faith and after reasonable investigation. Auerbach v. Bennett, supra; and Scheuer Family Foundation, Inc. v. 61 Assocs., 179 A.D.2d 65 (1st Dept., 1992). Absent a showing of fraud or lack of good faith, the actions of corporate directors must be respected by the courts. Auerbach v. Bennett, supra; Freer v. Mayer, 223 A.D.2d 667 (2nd Dept., 1996); and Matter of Breezy Point Cooperative, Inc., 123 A.D.2d 354 (1st Dept., 1986). See also, Crouse-Hinds Co. v. Internorth, Inc., 634 F.2d 690 (2nd Cir., 1980).
The business judgment rule applies to actions of corporate directors in the absence of a showing of discrimination, self dealing or misconduct. Auerbach v. Bennett, supra; and Jones v. Surrey Cooperative Apartments, Inc., 263 A.D.2d 33 (1st Dept., 1999). To overcome the business judgment rule, a shareholder must establish that "no person of ordinary sound business judgment would say that the corporation received fair benefit" in regard to the transaction. Aronoff v. Albanese, 85 A.D. 2d 3, 5 (2nd Dept. 1982). See also, Stern v. General Electric Co., 837 F.Supp. 72 (SDNY 1993). "If different businessmen might differ on the sufficiency of the consideration received by the Corporation, the courts will uphold the transaction. (citation omitted)." Aronoff v. Albanese, supra at 5-6.
However, the business judgment rule does not protect those officers or directors who have "dual relations which prevents an unprejudicial exercise of judgment." Auerbach v. Bennett, supra at 631; and In re Croton River Club, Inc., 52 F.2d 41(2nd Cir., 1995); and Lewis v. S.L. & E., Inc., 629 F.2d 764 (2nd Cir., 1980).
2.Interested Directors
A director is interested if he/she is an officer or director of another corporation involved in the challenged or questioned transaction. Rapoport v. Schneider, 29 N.Y.2d 396 (1972). See also, BCL §713. A director is interested in the challenged or questioned transaction when that director receives a direct financial benefit from the questioned transaction that is different from the benefit received generally by all shareholders. Marx v. Akers, 88 N.Y.2d 189 (1996). Alternatively, a director is considered interested even though that director has no personal interest in the questioned transaction where the director is controlled by a director who has an interest in the transaction. Park River Owners Corp. v. Bangser, Klein, Rocca & Blum, L.L.P., 269 A.D.2d 313 (1st Dept., 2000).
Where directors have an interest in the transaction, the burden of proof shifts to the interested director to establish that the actions involved in the questioned transactions were reasonable and fair. Alpert v. 28 Williams Street Corp., supra; In re Croton River Club, Inc., [*10]supra: and Lewis v. S.L.& E., Inc., supra. See also, BCL §713.
To determine the standard by which the directors' actions are to be judged, the court must determine whether the directors of Country Club are interested directors for the purposes of any of the challenged transactions.
The directors of Country Club are not interested directors for the purposes of the renewal of the Links lease. The interrelationship between those who are members of the Boards of both Links and Country Club was known to the members of the board of Country Club. While there is some overlap between the Country Club and Links boards, the annual renewal of the Links lease was approved by a majority of the disinterested Country Club directors those who are directors of Country Club but not director of Links. See, Rapoport v. Schneider, supra; and BCL §713.
Plaintiffs' reliance on Lewis v. S. L. & E., Inc., supra, in this regard is misplaced. In Lewis, the same individuals were the majority of the directors, officers and shareholders of both lessor and lessee. Those directors were therefore considered interested. Thus, the interested directors had the burden of proof in establishing the rent, which was supposedly unreasonable low, was fair and reasonable. That is not the case here. While there is some overlap between the boards of Country Club and Links, the renewal of the Links lease had repeatedly been approved by a majority of the Country Club directors who are not directors of Links. Since those directors of Country Club who are members of Links but not directors of Links are not, by definition, interested directors, the burden of proof is on the Plaintiffs to establish that the lease is unreasonable and that its renewal constitutes a waste of corporate assets. Plaintiffs have failed to meet this burden.
A director is interested in a transaction when the director receives a direct personal financial benefit different from those received by other shareholders. Marx v. Akers, supra; see also; Rales v. Blasband, 634 A.2d 927 (Del. Sup. Ct. 1993). The directors of Country Club received the same benefit that is conferred upon all of those who are shareholders of Country Club and members of Links, reduced dues and fees. These same benefits were available and provided to those Plaintiffs who were previously members of Links and would be available to any of the Plaintiffs if they chose to become member of Links. Therefore, the Country Club directors are not interested directors on this basis.
There is no suggestion that the directors of Country Club who are not directors of Links are controlled by the directors of Links.
Since the directors of Country Club are not interested directors, their actions must be evaluated through the prism of the business judgment rule.
3.Renewal of the Links Lease - Corporate Waste
In this case, the decision by the Country Club board to renew the Links lease for the years 2003 and 2004 was submitted to the shareholders for ratification. Plaintiffs assert that the renewal of the lease cannot be ratified by the shareholders since it is a void transaction. If the transaction is void, it may not be ratified by the stockholders. However, if the transaction is voidable, the transaction may be ratified by the stockholders. Aronoff v. Albanese, supra.
A gift or waste of a corporate asset are void acts which cannot be ratified by the stockholders of the corporation. Meredith v. Camp Hill Estates, supra; and Aronoff v. Albanese, supra. A gift involves the transfer of an asset without consideration. Meredith v. Camp Hill Estates, supra; and Aronoff v. Albanese, supra. See also, Michelson v. Duncan, 407 A.2d 211 (Del. Sup. Ct.1979).
[*11]The Links lease is not a gift. Country Club received consideration in that Links makes the mortgage payments on the property, pays the real property taxes, pays the insurance premiums, pays for the maintenance and upkeep of the buildings and the golf course which currently totals approximately $700,000.00 per annum. Any improvements made to the property by Links revert back to Country Club at the termination of the lease. This is clearly consideration for the lease.
On the other hand, waste is the "diversion of corporate assets for improper or unnecessary purposes (Michelson v. Duncan, 407 A2d211, 217 [Del])." Aronoff v. Albanese, supra at 5. In this case, Plaintiffs' claim of waste involves the assignment and use of corporate assets for less than fair consideration. Aronoff v. Albanese, supra. See also, Gottlieb v. McKee, 107 A.2d 240 (Del. Ch.,1954). Plaintiffs specifically allege that the directors of Country Club have renewed the Links lease annually since 1965 without increasing the rent, that they have failed to collect the rent from Links, that they have guaranteed Links debt and that they have sold treasury shares of Country Club stock at an artificially low price to pay for their defense of this action.
Plaintiffs assert that as a result of these actions by Country Club's directors that the shares of Country Club are sold at an artificially low price in relationship to the value of the property owned by Country Club.
In support of this proposition, Plaintiffs submit the affidavit from Jeffrey Dugas, an expert in the area of golf course appraisal. He avers that the fair, reasonable and proper rent for the premises should be 10% of the tenant's gross operating budget. This is substantially more than the $7,200.00 stated rent currently being paid by Links. He further opines that such leases are ordinarily "net-net leases" where the tenant pays, in addition to the rent, all carrying and operating charges on the property including real estate taxes, insurance, and salaries to persons employed at the club.
To counter this argument, Country Club submits the affidavit of Matthew Dapolito, its accountant, stating that, if Country Club were to increase the rent to the amount suggested by Mr. Dugas, approximately 44% of the rent collected by Country Club would be paid to the federal and state government as income, and other, taxes. After paying the taxes, each of the shareholders would receive a dividend of approximately $685.00. The shareholders would then be obligated to pay federal and state income tax on the dividend.
Mr. Dapolito further opines in his affidavit that his accounting firm presently is the accountant for 27 other private golf and country clubs in the metropolitan area. He states that, because of the tax consequences, private golf club realty corporations, such as Country Club, generally receive rent from the operating corporation in the amount necessary to cover its expenses.
If the directors of Country Club were to take the action recommended by Plaintiffs' expert, the dues of members of Links would have to be increased significantly. The biggest beneficiary of such a rent increase would be the federal and state governments which would collect almost 44% of the additional rent as taxes payable by Country Club. Additionally, the federal and state governments would collect additional income taxes from the shareholders of Country Club to whom those dividends were paid. At most, the shareholders of Country Club would receive a nominal return. Such a rent increase would not improve the operation of Country Club or make its shares any more marketable or valuable.
[*12]The Links lease permits the property to be used for the purposes for which it was intended and for which it has been used for more than 80 years as a private golf and country club in a cost effective manner and without causing Country Club or its shareholders adverse tax consequences.
While ordinarily this difference in expert opinions would raise questions of fact requiring a trial, in this case, these differing opinions indicate that the directors of Country Club are validly exercising their business judgment. The business judgment rule was designed to insulate directors from claims based upon the opinions of conflicting experts. Therefore, this Court will not "second guess" the decision of the directors regarding the fixing of the rent. See, Auerbach v. Bennett, supra. The action of the Country Club directors do not constitute a waste of corporate assets. Their decision to renew the Links lease is insulated from court challenge by the business judgment rule.
Since the decision regarding the amount of the rent to be charged Links and the terms of the lease do not constitute a waste of corporate assets, it is properly subject to ratification by the shareholders. Once an action of the board of directors of a corporation is ratified by the shareholders, it may not be reviewed by the court. BCL §§614(b) and 713(a)(2). See also, Rosenfeld v. Fairchild Airplane & Engine Corp., 309 N.Y. 168 (1955); and Cohen v. Ayers, 449 F.Supp. 298 (ND Ill., 1978). Therefore, the renewal of the Links lease for 2003 and 2004 cannot properly be challenged by Plaintiff shareholders herein.
While Country Club concedes that it did not collect the rent due from Links over the past several years, it asserts that it has received at least the equivalent of the rent in services in that Links has paid various Country Club expenses such as its accountant fees in lieu of paying rent. Links has also provided meals for meetings of Country Club's directors. Links and Country Club assert that these payments are in excess of $7,200.00 per year which is not disputed by Plaintiffs.
If the rent were collected, this money would then have to be used to pay those expenses that Links now pays on behalf of Country Club or those expenses incurred by Country Club for which it is not now charged. Even assuming that the full rent was collected and used to pay dividends, each shareholder would receive a dividend of $14.40 per share.[FN2]
4.Interest of the Plaintiffs
Country Club was incorporated in 1923. By amendment to the Certificate of Incorporation dated August 19, 1930, the purposes of Country Club were changed to indicate that one of the purposes of Country Club was "to promote golf." Country Club has never paid a dividend to its shareholders in its almost 80 years of operation. It does
not appear that anyone purchased shares of Country Club with the expectation of receiving a return on the investment.
Presently, 272 shares of Country Club are owned by individual Links members, 108 shares of Country Club are owned by Links and 120 shares are owned by individuals who are not members of Links. In the aggregate the Plaintiffs own a total of 8 shares of Country Club [*13]constituting 1.6% of the total shares of Country Club and 6.67% of the shares owned by individuals who are not members of Links. Thus, they are the small minority of Country Club shareholders who are not members of Links and an even smaller minority of all of the Country Club shareholders. Indeed, in addition to the Shapiro Plaintiffs, a review of each of the Plaintiffs reveals that most of them received their Country Club shares from family members who were well aware of the manner in which Country Club and Links were operated; to wit:
Plaintiff Thomas Hayes purchased his share of Country Club in 1962. He served as an officer of Country Club for a number of years. He was also a member of Links. Mr. Hayes presently suffers from Alzheimer's. His son, Thomas Hayes, Jr., has joined as a Plaintiff acting as his father's attorney-in-fact
pursuant to a power of attorney. Mr. Hayes, Sr., has no knowledge of this action.
Plaintiffs Richard Gould and Susann Johnson, jointly own one share of Country Club which they inherited from their father, Irving Gould, who died in 1991. Irving Gould purchased his share in Country Club in 1959 and was a member of Links for many years. Richard Gould joined the action as a Plaintiff to make certain that he received his share of the proceeds of sale of the property if the property was ever sold.
Plaintiff Joan Peter owns either one or two shares of Country Club, having inherited one share on the death of her first husband, John Donnlen, and possibly a second share upon the death of her second husband, Alexander Peter. She was a house member of Links after the death of her husbands. Although she claims it was an error, she voted for the renewal of Links lease for the year 2003, which would be a direct contradiction of the position she has taken as a Plaintiff in this action.
Plaintiff Gino Scalamandre purchased his share in Country Club in 1950. He was a member of the Country Club prior to Links' incorporation and a member of Links from its incorporation through 1965. As a member of Links, he received the benefits of reduced dues and fees.
Plaintiffs Betty Ann Marshall and Robert Huber jointly own one share of Country Club which they inherited from their uncle, Anthony Cummings, on his death in 1991. Mr. Cummings purchased his share of Country Club in 1959 and was a member of Links.
Only two of the Plaintiffs, Thomas Hayes, Sr. and Gino Scalamandre actually purchased their shares in Country Club. Mr. Scalamandre purchased his share in Country Club prior to Links incorporation and enjoyed the benefits of being a County Club shareholder when Links was incorporated. Prior to his illness, Mr. Hayes was a member of Links. Clearly, they purchased their shares of Country Club when they wished to avail themselves of the facilities and to obtain the benefits running to those who are stockholders of Country Club and also members of Links.
The other Plaintiffs inherited their shares. With the exception of the Shapiro Plaintiffs, the persons from whom they inherited the shares were members of Links who enjoyed the benefits of being a shareholder of Country Club and a member of Links. These people most [*14]certainly did not obtain ownership of their shares of Country Club for the return on investment.
5.Sale of Country Club Stock to Pay Legal Fees - Fraud
Country Club concedes that it sold 10 shares of treasury stock of County Club to Links in February 2002 for $30,000.00 to help pay for the legal fees incurred in the defense of this action.
Business Corporation Law §504(e) permits the board dispose of treasury shares "...on such terms and conditions as are fixed from time to time by the board." In the absence of fraud, the decision of the board as to the adequacy of the consideration is conclusive. BCL §505(h). See also, Buffalo Forge Co. v. Ogden Corp., 555 F. Supp.
892 (WDNY), aff'd., 717 F.2d 757 (2nd Cir.), cert. den., 484 U.S. 1018 (1983). There is no evidence of fraud in the sale of the treasury stock.
In order to prove fraud, the Plaintiff must establish by clear and convincing evidence a representation of a material fact, falsity, scienter, reliance and injury. Small v. Lorillard Tobacco Co., 94 N.Y.2d 43 (1999); and Vermeer Owners, Inc. v. Guterman, 78 N.Y.2d 1114 (1991). See also, Kline v. Taukpoint Realty Corp., 302 A.D.2d 433 (2nd Dept., 2003). Plaintiffs have failed to establish any of the elements of fraud in the connection with the sale by Country Club of its treasury shares. The price for which these treasury shares were sold was the existing market price for the shares.
The cases relied upon by the Plaintiffs are distinguishable. In Siverio v. Lavergne, 1991 WL 220974 (SDNY), the Board approved the issuance of treasury shares of Command Broadcast Associates, Inc. at $10.00 per share to Lavergne and Cameron while simultaneously approving the issuance of shares of Command to Lapoche and Mardach for $20,000.00 per share. Cameron and Lavergne constituted 2 of the 3 directors of Command who approved this sale. The Siverio Court concluded that the transaction constituted a breach of Camerom and Lavergne's fiduciary duty since it conferred a direct financial benefit upon them and was being used as a means to force Siverio to sell his shares. The gross discrepancy in the price of the shares issued coupled with the fact that this artifice was being used to dilute the interest of Siverio in the corporation constituted a breach of Cameron and Lavergne's fiduciary duty. Neither of these factors are present in this case. The sale is to one party, Links, for the going price of the shares. The sale of the shares is not being used to dilute Plaintiff's interest in Country Club. Furthermore, the Siverio Court did not mention, consider or comment on BCL §§504(e) or 505(h) in reaching its decision.
In addition, Plaintiff's reliance upon Rizzo v. The MacManus Grp., Inc., 158 F.Supp. 2d 297 (SDNY, 2001) is also misplaced. Rizzo involves a claim of fraud by the former chairman and chief executive officer of Defendant relating to the value of his shares in a severance package. In the severance package, Rizzo's shares were purchased for five cents per share. A few weeks later, those same shares were valued in a merger at $14.8 million. The Court held that MacManus and its officers had an affirmative fiduciary duty pursuant to the Securities Exchange Act of 1934 (15 U.S.C.§78j[b]) and the regulations promulgated thereunder (17 C.F.R. §240.10b-5) to disclose material non-public facts to Rizzo regarding the value of his shares. The Rizzo case does not involve the issuance of treasury shares by the corporation and does not mention or involve BCL §§504(e) and 505(h).
Plaintiffs are dissatisfied with the actions taken by the Country Club board. However, this is precisely the type of activity protected by the business judgment rule and BCL [*15]§§504(e) and 505(h).
6.Country Club's Guarantee of Links' Line of Credit
Plaintiffs allege that Country Club's guarantee of Links line of credit constitutes of waste of Country Club's assets. However, this claim is speculative. It is unclear whether Links has ever used the line of credit. Country Club has never been asked to make any payments on this line of credit. Therefore, Country Club has suffered no damage as a result of the guarantee.
7.Devaluation of Country Club Shares
Plaintiffs further allege that the actions of the Board have artificially depressed the value of their shares and have made them unmarketable. However, the value of Plaintiff's shares is a function of the nature of Country Club and its business practices. Country Club was formed more than 80 years ago to operate a golf club. It has never paid a dividend. Even though County Club is a business corporation, it has never been operated at a profit nor has there ever been a large market for its stock. Country Club does not have to sell its property or lease it to assure the highest rate of return. All that is required is that the directors exercise their business judgment fairly and honestly to accomplish the purpose for which the corporation was formed.
When deciding whether an action of the board of directors is the in best interest of the corporation, the interest of an individual stockholder or a small group of stockholders must give way to the interests of the majority of stockholders. Alpert v. 28 Williams Street Corp., supra; and Kavanaugh v. Kavanaugh Knitting Co., 226 N.Y. 185 (1919). This is precisely what has been done here.
Plaintiffs are not without remedy. As shareholders of Country Club, they can seek election to the Board and seek to change corporate policy through that means. See, Matter of Breezy Point Co-op, Inc., supra.
For the foregoing reasons, Defendants' motion to dismiss the first cause of action must be granted and Plaintiffs' motion for summary judgment must be denied.
F. Aiding and Abetting a Breach of Fiduciary Duty
The second cause of action in Plaintiffs' amended complaint alleges:
"118. Links has conspired with one or more of the Directors Defendants and has
encouraged, facilitated, aided and abetted and participated in the breach by such Director Defendants of their respective fiduciary duties owed to Rockville and its shareholders."
In order to establish a claim for aiding and abetting a breach of fiduciary duty, Plaintiff must prove that the primary fiduciary violated its duty, that the aider and abettor had knowledge of the violation and that the aider and abettor substantially assisted in the violations. Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57 (2nd Cir., 1985); and Briarpatch Limited L.P. v. Geisler Roberdeau, Inc., 2002 WL 31426207 (SDNY, 2002). See also, Snyder v. Puente De Brooklyn Realty Corp., 297 A.D.2d 432 (3rd Dept., 2002).
Since the Court has concluded that the primary fiduciaries the directors of Country Club did not violate their fiduciary duty, the Plaintiffs logically cannot then establish the first element of the cause of action. That is, if the directors of Country Club did not violate a fiduciary duty, then the directors of Links could not have aided or abetted their violation of a fiduciary duty. Therefore, the second cause of action must also be dismissed and Plaintiffs' summary judgment motion thereon denied.
G. Plaintiff's Motion for Leave to Add Additional Parties
Plaintiff seeks to add as additional Defendants those persons who were identified as [*16]directors of Country Club and/or Links as a result of discovery. This motion should be denied as moot since the amended complaint herein is being dismissed.
Accordingly, it is,
ORDERED, that Plaintiffs' motion for partial summary judgment as to liability on its first, second, third and fourth causes of action in their Second Amended Complaint is denied; and it is further,
ORDERED, that Plaintiffs' motion for leave to serve a third amended complaint is denied as moot; and it is further,
ORDERED, that the motion of the Defendant Rockville Country Club, Inc. and its directors for summary judgment dismissing the complaint is granted and, in all other respects, is denied as moot; and it is further,
ORDERED, that the motion of Rockville Links, Inc. and its directors for summary judgment dismissing the complaint is granted; and it is further,
ORDERED, that the complaint is hereby dismissed.
This constitutes the decision and order of the Court.
February 23, 2004 Hon. LEONARD B. AUSTIN, J.S.C.
XXX
Decision Date: February 23, 2004
Footnotes

Footnote 1:It appears that Gerry Marcoux has never been served and has not appeared in this action.

Footnote 2: Rent is presently $7,200.00 per year. County Club has issued 500 shares. If the entire rent were collected and used to pay dividends, each shareholder would receive $14.40 per share. ($7,200 ÷ 500 = $14.40).